IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SKYNET, LLC, a Nebraska limited liability company, | ) ) ) | Case No: 4:24-cv-03191 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **SECOND AMENDED COMPLAINT & JURY DEMAND** |
| TITAN LABS, LLC, a Florida limited liability company, CHRIS COLLUM, an Individual, SHERI GARCIA, Individually and as an officer of Titan Labs, LLC, and MARK HAUGHEY, Individually and in his capacity of Manager of Titan Labs, LLC, | ) ) ) ) ) ) ) ) | |
| Defendants. | | |

Plaintiff, SKYNET, LLC, a Nebraska limited liability company, by and through counsel, for its Second Amended Complaint against the Defendants, TITAN LABS, LLC, a Florida limited liability company, CHRIS COLLUM, SHERI GARCIA and MARK HAUGHEY, states and alleges as follows:

1. Plaintiff Skynet, LLC ("Skynet") is a limited liability company formed under the laws of the State of Nebraska with its principal place of business in Seward, Seward County, Nebraska.

2. Defendant Titan Labs, LLC ("Titan") is a Florida limited liability company with a principal address of 17016 Woodcrest Way, Clermont, FL 34714.

3. Defendant Chris Collum ("Collum") is a resident of Texas and a Member of Titan.

4. Defendant Sheri Garcia ("Garcia") is a resident of Florida and the Chief Financial Officer of Titan.

5. Defendant Mark Haughey ("Haughey") is a resident of Florida and both a Member and the Manager of Titan.

6.     It is unknown whether Haughey and Collum are the only members of Titan, whether Garcia is a member of Titan, or who else may have been involved on Titan's behalf in the events described herein. Skynet reserves the right to add additional parties as necessitated by discovery in this matter.

7.     Personal jurisdiction is appropriate over each of the Defendants for the following reasons, which list is not intended to be exhaustive:

a. Defendants have purposefully availed themselves of the privileges and benefits of doing business in Nebraska through selling computer equipment directly to Nebraska residents, including Skynet, and through the systematic and continuous management of data centers and server equipment physically located within Nebraska; and

b. Defendants' actions associated with such sales and management are directly related to the basis of this lawsuit, with such contacts specifically giving rise to the claims set forth herein.

8.     Venue and subject matter jurisdiction are proper in this Court on the basis that all or substantially all of the actions underlying this lawsuit occurred in Seward County and Skynet is headquartered within Seward County.

9.     On or about September 6, 2023, Haughey, on behalf of Titan, and Ben Benson, one of the members of Skynet, discussed and agreed upon certain terms related to the sale and purchase of equipment and management of servers by Titan for Benson and various entities that would actually purchase and maintain said servers. Those terms included the following:

a. Titan to supply new enterprise computer equipment at distributor's cost plus 10% or used equipment at purchase price plus 10%, including delivery and setup of all equipment and attendant network infrastructure;

    b. Titan to configure enterprise systems to Benson/purchaser's specific requirements;

    c. Titan to manage, market, and provide 24/7/365 monitoring of customer equipment in exchange for payment of 20% of the revenues generated by the equipment during the time under management;

    d. Titan to issue weekly usage and revenue reports for all managed equipment;

    e. Titan to make weekly payments of revenues earned with equipment, less its 20% management fee;

    f. Titan to employ an Artificial Intelligence (AI) pricing mechanism to maximize system revenue and uptime; and

    g. Sold equipment to be solely owned by Benson or applicable entity.

10. Titan prepared a written contract with additional terms seeking to memorialize the oral agreement, but such contract was never signed by Skynet.

11. In addition to the services to be provided by Titan to Skynet, Skynet agreed to provide hosting services to Titan on two enterprise machines and Titan agreed to pay Skynet for the same.

12. The course of dealing between the Parties evidenced a common understanding of the terms of the oral agreement under which the Parties operated.

13. The initial equipment purchase under the aforementioned arrangement occurred on or about November 11, 2023, and included $299,780.48 worth of enterprise equipment. Invoices provided by Titan reflected the agreed-upon markup of 10% over distributor cost and the equipment was installed in Seward at Skynet's facility.

14. On June 6, 2024, Skynet discovered that Titan had substituted inferior and cheaper equipment for the equipment that was specified and paid for by Skynet, and

misrepresented to Skynet what had been provided. The number of instances in which Titan substituted inferior equipment and the amount of damages suffered by Skynet as a result is unknown at this time, but will be proven at trial.

15. Titan confirmed the equipment would be monitored around the clock and, specifically at Benson's request, agreed that they would notify Benson immediately of any errors so that Benson could inspect the equipment in person.

16. On the night the equipment was installed, an air conditioning unit on the roof of Skynet's facility starting leaking and water ran onto the enterprise equipment through the ceiling.

17. Titan personnel were actively monitoring the system at the time the leak occurred and noted the error messages as one machine at a time went offline, but did nothing to notify Benson or Skynet of the issue at any time.

18. Benson stopped by the site the next morning before church and found standing water and extensive damage to the newly installed enterprise equipment. Benson stopped the leak, cleaned the premises, and took the equipment out to attempt to salvage what he was able to salvage.

19. Benson, on behalf of Skynet, incurred costs of approximately $30,000 in replacement parts and labor to repair the equipment and reinstall it at the Seward site.

20. Since November 2023, Skynet has purchased additional equipment from Titan and Titan has continued to manage all of such equipment purchased by Skynet.

21. During the entirety of that time, Titan has repeatedly failed and refused to provide weekly reports and payments to Skynet, instead unilaterally deciding to only provide such reports and payments every two weeks, despite Skynet's objections.

22. Titan has further failed to configure and enhance the enterprise systems to Skynet's requirements and failed to employ AI pricing to increase system revenue and uptime.

23. On or about May 30, 2024, Skynet recognized a discrepancy between the list price and the amount charged by Titan on a shipment of equipment purchased from Titan. Upon further review, Skynet discovered that the invoice from Titan appeared to be an intentional alteration of the actual supplier invoice.

24. As a result of this discrepancy, Skynet performed further analysis of recent purchases from Titan based on Skynet's own records, including getting information directly from some original suppliers as to how much Titan paid for the equipment, and discovered that Titan had misrepresented the actual purchase prices substantially. Investigation is ongoing, but Skynet has so far identified six transactions which, collectively, establish overpayments to Titan in the amount of $108,170.82.

25. Between November 2023 and June 2024, Skynet requested access to the servers on numerous occasions so that it could monitor activity on its own system and confirm that Titan was appropriately managing Skynet's enterprise equipment. However, Titan consistently refused to allow Skynet to access its own system.

26. Titan's refusal to allow Skynet access to its systems has frustrated Skynet's ability to monitor, manage, and analyze its own equipment, compromised Skynet's ability to secure and manage risk, as well as effectively depriving Skynet of the opportunity to conduct its business or to timely discover Titan's misrepresentations with regard to what equipment was provided to Skynet.

27. Skynet terminated its oral contract with Titan, effective immediately, on June 7, 2024. Despite such termination, in response, Titan continued to refuse to allow Skynet to access its own systems and instead threatened to commence litigation.

## **FIRST CAUSE OF ACTION: BREACH OF CONTRACT**

28. Skynet incorporates by this reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

29. Skynet purchased goods and services from Titan according to an oral contract including the terms set forth above.

30. Skynet has fully performed its obligations under the oral agreement with Titan.

31. Titan has breached the contract in several instances, including but not limited to the following:

   a. Failure to properly monitor and notify Skynet of error reports at the site, resulting in substantial damage to Skynet's equipment;

   b. Failure to make payments in a timely manner;

   c. Failure to provide machine usage reports in a timely manner;

   d. Misrepresenting the purchase prices of enterprise equipment sold to Skynet;

   e. Failing to deliver equipment meeting the specifications ordered by Skynet;

   f. Using Skynet's system without authorization to generate profits from other sources;

   g. Blocking Skynet from accessing its own enterprise equipment for purposes of system monitoring, maintenance, optimization, and analysis;

   h. Failing and refusing to deliver equipment in its possession for which Titan has made payment in full; and

   i. Failing and refusing to pay hosting fees owed to Skynet that are due as of June 26, 2024.

32. As a direct and proximate result of Titan's breach of contract, Skynet has suffered damages in the amount of at least $226,525.13, the full nature and extent of which will be proven at trial, plus additional damages that are still accruing. At present, the damages include, but are not limited to the following:

    a. Cost to repair/replace machines damaged due to Titan's failure to properly monitor: $30,000.00

    b. Amounts overcharged for equipment: $108,170.82

    c. Value lost due to wrong items being shipped: $828.36

    d. Lost revenues in the amount of at least: $23,667.98

    e. Unpaid hosting fees: $825.30

    f. Purchased but undelivered equipment: $16,008.00

    g. Tech and on-site support for reconfiguring network: $22,024.67

    h. Unremitted profits from system operation prior to termination (approximate): $25,000.00

    i. Additional damages resulting from defective, underperforming, non-conforming, and/or unrepaired equipment in an amount to be determined.

## SECOND CAUSE OF ACTION: FRAUD

33. Skynet incorporates by this reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

34. Titan grossly overcharged for enterprise equipment provided to Skynet, in violation of its representation that such equipment was being provided at a 10% markup from distributor cost and actively concealed that it was providing nonconforming equipment, as well as charging for equipment that was never provided.

35. In furtherance of its overcharging for said equipment, and in order to conceal such actions from Skynet, Titan actively and intentionally fabricated one or more fraudulent

invoices that reflected higher prices than were actually incurred by Titan for its purchase of the equipment to be resold to Skynet.

36.     Specifically, on or about May 17, 2024, Skynet ordered and paid $1,590.00 each for 26 new Samsung drives from Titan, which Titan sourced from a third-party supplier.

37.     On or about May 28, 2024, Skynet received 26 *refurbished* Samsung drives. Upon questioning Titan regarding the same, Mark Haughey sent screenshots of the alleged invoice from the supplier, showing that the order had been placed for new drives and that Titan had paid $1509.00 per drive. Titan did not provide an actual invoice, but the screenshot matched the style of other invoices from that particular supplier.

38.     On May 30, 2024, Benson called the supplier directly to figure out why refurbished drives had been sent in place of the new ones. The supplier informed him that Skynet was "getting fucked" and that Titan had ordered and paid $1,050.00 per unit for the refurbished drives.

39.     Skynet requested a copy of the original invoice from the supplier containing this information, but was told that it was against their policy to provide copies of customer invoices.

40.     Upon information and belief, based upon review of other purchases from Titan and the attendant retail prices of the equipment purchased, this was not an isolated event, but a single instance within a pattern of fraudulent activity by Titan and one or more of its members.

41.     In reviewing purchase records on other transactions between Titan and Skynet, Skynet discovered that Titan had charged actual markup between 35% and over 66% on various motherboards, CPUs, NIC Adapters and other computer equipment throughout the course of dealing, all the while maintaining that it was providing pricing to Skynet that was 10% over its cost.

42. The total amount of fraudulent charges identified by Skynet is $108,170.82. However, all invoices and other documentation needed to fully determine the extent of fraudulent activity is wholly within the control of Titan and/or its members and unavailable to Skynet.

43. In addition to misrepresenting and concealing pricing data, Titan also misrepresented the exact nature of what equipment was being provided to Skynet, and actively concealed its misrepresentations so that Skynet was unable to discover the problem until after the contract between the parties was terminated.

44. Specifically, by way of example, on or about October 9, 2023, Titan Labs provided an invoice to Benson (then acting as the precursor-in-interest to Skynet) listing out a number of components that were to be included in Firewall devices and a remote management server to be installed upon Skynet's premises.

45. When Benson discussed the price of building out two, 10GB router/firewall devices with Titan, Titan indicated that the price would be approximately $19,400.00. However, at the time the invoice was prepared, Titan charged a total of $37,263.54, based on some revisions to the plan that included additional components, which were listed on the invoice.

46. After placing the order, the equipment shipped from Titan's suppliers to Chris Collum, who was tasked with configuring the firewalls and a remote management server, closing up all of the components inside the units.

47. Upon arrival and installation at Skynet's facility, Titan insisted that Skynet not open up the firewalls or the remote management server, indicating that to do so would risk Titan's intellectual property and they would consider it to be a breach of contract by Skynet.

48. As such, Skynet took Collum and Titan at their word that the machines included all of the purchased components.

49. After Titan breached its contract with Skynet, Skynet had to disassemble the firewalls to reconfigure them for use with its new system, at which point in time Skynet discovered that the units did not include many of the components listed on the invoice and for which Skynet had made payment to Titan. It is unknown at this time what the total value of the missing components is, as the invoice provided a lump cost for all of the components rather than a line-by-line pricing.

50. Finally, throughout the contract period, Titan continually provided sub-par and nonconforming parts while representing to Skynet that it was compliant with Skynet's orders and specifications. One example of this involves CPUs that were delivered to Skynet by Titan as part of the last shipment of goods provided. On or about June 10, 2024, Skynet realized that Titan had provided used CPUs, but charged Skynet for new CPUs at new CPU prices. After Skynet pointed out that the CPUs were used to Collum, Haughey became defensive and doubled down on his misrepresentation that the CPUs were new – despite clear evidence in the form of leftover thermal paste evidencing that the CPUs had been previously installed in another system.

51. The total number of instances of such unauthorized substitutions or provision of non-conforming goods is unclear at this time, with Skynet regularly uncovering additional problems as it continues to try to undo all the damage to its operation occasioned by Titan and its members. As with the firewall devices, Skynet was prevented from accessing diagnostic or system data that would have revealed the fraud until after Titan's services were terminated.

52. Each of the members of Titan directly participated in and worked together to perform the fraudulent actions taken against Skynet. At a minimum:

a. Haughey represented that Skynet was being charged 10% over distributor cost, yet charged a premium between 35% and 66% over distributor cost, as well as sending a falsified invoice to Skynet on behalf of Titan. Haughey further misrepresented that CPUs sent with the last shipment from Titan to Skynet were in new condition, when they were used CPUs;

b. Garcia, who lives with and works closely with Haughey, represented to Skynet that she was the Chief Financial Officer of Titan and was responsible for all billing and invoicing, which would presumably include making alterations, either on her own or at the direction of Collum and Haughey, to the cost basis or the markup percentages assessed against Skynet; and

c. Collum, with full knowledge of the specifications of the firewall systems in Skynet's operation, performed the building and configuring of machines with knowledge that Skynet was paying for components that he was not installing and then concealed those material facts from Skynet by not allowing access to the machines in order to verify the presence of paid-for components.

53. Upon information and belief, each of the Defendants were aware of and acted together in concert to perpetuate the pattern of fraudulent misrepresentation of equipment pricing and concealment of the equipment being provided to Skynet. All information related to sourcing, invoicing, pricing adjustments, and supplier invoices, in addition to internal communications, that is necessary to fully prove the details for this cause of action is in control of Titan and unavailable to Skynet.

54. As a result of their actions on behalf of Titan, Haughey, Garcia and Collum, individually, are jointly and severally liable for the damages caused by their use of Titan to commit fraud against Skynet.

### THIRD CAUSE OF ACTION: CONVERSION

55. Skynet incorporates by this reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

56. Skynet is the owner of certain enterprise equipment and attendant software located within its facility in Seward County, Nebraska.

57. Titan was engaged to provide management services over the enterprise equipment, but instead, through electronic means, took possession of the operational systems within such enterprise equipment and unlawfully exercised dominion and control over the same.

58. Titan deprived Skynet of its possessory and ownership rights associated with the systems maintained upon Skynet's enterprise equipment.

59. Further, it appears that Titan used Skynet's enterprise equipment to generate income for Titan's purposes that was concealed and withheld from Skynet.

60. Due to Titan's actions, Skynet was required to completely shut down the site in order to reclaim the use of its servers, causing additional cost and loss of revenue while the systems were restored.

61. As a result of the foregoing, Skynet has been damaged in an amount that will be proven at trial and is entitled, at a minimum, to lost revenues and all profits realized by Titan as a result of its unauthorized use of Skynet's equipment.

62. Skynet hereby demands this matter be tried before a jury.

**WHEREFORE**, Skynet prays this Court enter judgment in its favor and against the Defendants and to issue one or more Orders providing:

A. Judgment against Defendant Titan Labs, LLC, to pay Skynet the amount of $118,354.31 plus such additional amounts as are proven at trial;

B. Judgment against Defendants, jointly and severally, to pay Skynet the further amount of $108,170.82, plus such additional amounts as are proven at trial;

C. for immediate equitable relief requiring Titan to provide Skynet's equipment that is in its possession;

D. for pre-judgment and post-judgment interest at the statutory rate on all damages;

E. for the costs of this action; and

F. for all such other relief as is authorized under principles of law or equity within the State of Nebraska.

SKYNET, LLC, a Nebraska limited liability company, Plaintiff,

By: _____
Nicholas R. Norton, #25131
BLACK SHEEP LAW, LLC
P.O. Box 1417
Kearney, NE 68848
Phone: (402) 302-2422
Fax: (402) 500-3950
nic@blacksheeplawgroup.com

and

By: */s/ Nicholas J. Ridgeway*
Nicholas J. Ridgeway, #26620
*nridgeway@jacobsenorr.com*
JACOBSEN ORR, LINDSTROM
& HOLBROOK, P.C., L.L.O.
Attorneys at Law
5408 Global Drive | P. O. Box 1060
Kearney, NE 68848-1060
308-234-5579 | 308-234-9305 (fax)

*Attorneys for Plaintiff*